## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MARIANNA GRECO BRADLEY,** | : | **Civil No. 3:15-CV-1882** |
| | : | |
| **Plaintiff** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **v.** | : | |
| | : | |
| **CAROLYN COLVIN,** | : | |
| **Commissioner of Social Security,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

## I.   INTRODUCTION

Now pending before the Court is Marianna Greco's appeal of an administrative law judge's denial of her application for Social Security Disability benefits under Titles II and XVI of the Social Security Act.[1]  Ms. Greco applied for Title II disability benefits on December 6, 2011, alleging a disability beginning on July 1, 2010, on the basis of bilateral hearing loss.  Ms. Greco's application was initially denied on March 20, 2012.  She appealed this initial decision and requested a hearing before an ALJ.  While this request was pending, Ms. Greco protectively filed a Title XVI application for Supplemental Security Income

---

[1]  Although the plaintiff in this case is identified in the caption is Marianna Greco Bradley, she was referred to throughout the administrative proceedings as Marianna Greco, and she has been referred to as Marianna Greco in her briefs and other filings.  We refer to her accordingly in this opinion.

Disability Benefits on June 13, 2012.  This application was consolidated with the Title II application in the proceedings before the ALJ.

Multiple hearings were held on the Ms. Greco's claims, after which the ALJ issued an order denying benefits on May 8, 2014.  Ms. Greco appealed the decision and requested review by the Appeals Council.  On August 3, 2015, the Appeals Council denied this request for review.  This litigation followed.

Ms. Greco has challenged the ALJ's ruling in three principal respects, all of which relate to the ALJ's decision regarding Ms. Greco's residual functional capacity to perform certain work.  First, she argues that the ALJ failed to consider the specific testimony of the audiologist, particularly with respect to what the plaintiff contends was quite limited testimony regarding any potential benefits that hearing aids would provide, and also regarding the specific limitations and restrictions that the plaintiff's hearing loss would cause in an employment setting.

Second, the plaintiff takes issue with the ALJ's given reasons for not finding her testimony fully credible with respect to the extent of her hearing loss and its limitations on her ability to perform daily functions and to engage in functions relevant to her ability to work.  The plaintiff contends that the ALJ placed undue weight on the fact that the plaintiff had sought unemployment benefits during the period in which Title II disability benefits were being claimed, and otherwise provided inadequate justification for finding her testimony not fully credible,

particularly given other testimony from the plaintiff, her husband, and treating records which show that she has profound hearing loss in both ears, and that she has experienced severe side effects when attempting to use hearing aids.

Finally, and in the Court's estimation most significantly, the plaintiff maintains that the ALJ failed adequately to consider the testimony of the vocational expert with respect to the likelihood that Ms. Greco would require substantial accommodations to perform the jobs that he identified as those she potentially could perform.  Indeed, in response to questioning by counsel, the vocational expert gave some answers that suggested Ms. Greco would require substantial accommodation and that her hearing limitations would likely preclude her from being seriously considered for any of the jobs identified.  According to Ms. Greco, this failure was significant, because agency rulings and guidance in this field teach that it is error to consider whether a claimant can perform the identified jobs only with accommodations that might be required under the Americans with Disabilities Act.  Moreover, the ALJ declined to address in any substantive fashion this aspect of the vocational expert's testimony, instead finding that the plaintiff was capable of performing each of the three jobs that the vocational expert identified as those that she could conceivably perform, and which existed in sufficient numbers in both the regional and national economy.

The parties have consented to have this matter heard and decided by a Magistrate Judge, and the appeal is fully briefed and is ripe for disposition. For the reasons that follow, the Court agrees that the ALJ failed adequately to explain the reasons why he found Ms. Greco less than credible regarding her subject complaints, particularly with respect to Ms. Greco's essentially unrebutted testimony that the use of hearing aids has caused her severe side effects that may diminish their efficacy. More significantly the Court finds that the ALJ failed to develop the record with respect to critical testimony of the vocational expert that was hesitant and qualified regarding Ms. Greco's qualification for the jobs he suggested she might be capable of performing, consequently the ALJ issued a written decision that lacked sufficient support for the findings regarding Ms. Greco's residual functional capacity to perform those jobs. Accordingly, for the reasons that follow the Court will order this matter remanded to the Commissioner for further consideration of Ms. Greco's claim for benefits.

## II.   <u>BACKGROUND</u>

Marianna Greco was born on October 21, 1974. She was only 35-years-old on the date of her alleged onset of disability, July 1, 2010, which makes her a "younger person" under controlling regulations. 20 C.F.R. §§ 404.1563, 416.936 (defining a younger person as someone under the age of fifty, whose age will not seriously affect her ability to adjust to other work). She has held prior employment

as a cook for approximately a year and a half, including the time she claims to have been disabled.  (Tr., Ex. 2E, page 3.)  She also worked as a certified nurses' aide in a nursing home from 2007 until April 2011.  (Id.)  She stopped working in April 2011 because she was pregnant at the time and because she was having increasing difficulty hearing the nurses around her because of a hearing impairment.  The ALJ found that although the plaintiff engaged in some work after her alleged disability onset date, she was not engaged in work activity that rose to the level of substantial gainful activity under prevailing regulations.[2]  (Tr. 17.)  The record also reveals that the plaintiff received unemployment benefits during the period of alleged disability, between 2011 and 2012.  (Tr. 17, 264-65.)

In January 2012, the plaintiff completed a Function Report in connection with her disability applications.  (Tr. 313-20.)  In this report, the plaintiff reported that she lived with her husband and children, took care of the family dog, tended to her personal care needs, prepared meals daily, performed chores, shopped, and managed her finances.  (Tr. 313-15, 317.)

During the hearings held on her application, the plaintiff appeared and testified, but required the assistance of her husband in order to understand and respond to the ALJ's questions.  (Tr. 39.)   The record reflects that upon

---

[2]  Years prior to her alleged onset date, the plaintiff also worked as a claims investigator for an insurance company from 1999 to 2005.  Between 1997 and 2004, she also worked as an administrative assistant with an excavation company.  (Tr. 21, 281.)

questioning from the ALJ, the claimant's husband would repeat or rephrase the ALJ's questions so that she could understand and provide answers. Much of the questioning centered on the plaintiff's alleged basis for claiming disability, which was the progressive worsening of her hearing in both ears, something that developed in childhood and has persisted into her adult years, recently become especially profound, particularly in her right ear.

On this score, it is undisputed that Ms. Greco has experienced profound hearing losses over time. The plaintiff testified that she is no longer receiving treatment for her binaural hearing loss because the doctors have told her that her nerves are "shot". (Tr. 45.)  The plaintiff acknowledged that she used to wear hearing aids, but testified that she experienced intolerable side effects when she tried to use them, including severe headaches that would last throughout the day and night, and which affected her ability to sleep. (Tr. 46.)  She testified that she would suffer headaches more than once a week, and that when she did so she would also experience nausea to the point of nearly vomiting. (Tr. 46)

Ms. Greco's husband, Michael Bradley, also testified at the hearing. He testified that he and Ms. Greco had been married for ten years at the time of the hearing, and that he had known her for approximately 13 years. (Tr. 47.)  He testified specifically and in greater detail about the problems he had observed when his wife would try to use hearing aids. He testified that she had been using hearing

aids since childhood, but began experiencing problems with them as an adult.  She and her husband actually became concerned that the hearing aids were no longer working, when at one point she claimed to be no longer hearing anything in one of her ears, and was having trouble with the other as well.  According to Mr. Bradley, the problem with the hearing aids may have stemmed from the fact that they were not working well in conjunction with one another, which is why she was experiencing pain.  He testified that despite their efforts to experiment with volume levels and different types of hearing aids, it got to the point where they were not working for his wife at all, and resulted in her suffering adverse side effects.  (Tr. 47-48.)

Mr. Bradley testified that Ms. Greco can no longer attend school functions and meet with her three children's teachers.  (Tr. 48.)  He explained that his wife had begun answering "yes" to many questions, tending to simply agree with what someone was saying to her because she could not hear and was embarrassed.  (Tr. 49.)  By way of example, he testified to one incident during which his wife answered "yes" to the question during a job interview with a nursing home about whether she had ever harmed a resident because she could not understand what was being asked of her.  (Tr. 49-50.)  Notwithstanding answers contained in Ms. Greco's Function Report, Mr. Bradley testified that he now pays all the bills, and is responsible for all household responsibilities.  He testified that his wife now has

difficulty driving and has fear of what people around her are doing or saying.  (Tr. 51-52.)

In later testimony, Ms. Greco attested that her hearing has continued to worsen since the initial proceeding before the ALJ.  (Tr. 79.)  She offered testimony about her struggles in school that stemmed from her inability to hear her teachers and because she experienced dizziness.  (Tr. 80-81.)  Ms. Greco testified to being a poor student, something her school records corroborate.  (Tr. 81, 358-364.)

Dr. Sabina Scott testified as an examining audiologist about her functional capacity assessment of Ms. Greco.  (Tr. 55.)  She completed a Medical Source Statement prior to testifying on December 9, 2013.  In her Medical Source Statement, dated July 14, 2013, Dr. Scott noted that Ms. Greco's hearing loss would make it difficult for Ms. Greco to work in any setting that required a keen sense of hearing and communication, one-on-one communication or communication in groups, anywhere with background noise, anywhere where people were not facing her, and on the telephone.  (Tr. 431.)  In response to questioning from the ALJ, Dr. Scott offered the following opinion about Ms. Greco's likely residual functional capacity without the assistance of a hearing aid:

> She will have difficulty in many different situations
> without a hearing aid.  Quiet, background noise, one-on-
> one, groups, crowds, warning signals, alerting signals.
> She'll need everything turned up much louder.  She'll

> probably have to ask people to repeat frequently. Difficulty understanding, you know, all types of voices, women, kids, whispering, louder speech, foreign accents, non-speech sounds. It would be difficult for her to engage in any kind of work requiring a lot of verbal or social interaction and communication, complex instructions. Ability to hear distinctions in speech or sounds. A job that would require that would be very difficult without hearing aids.

(Tr. 56.) In response to questioning by Ms. Greco's counsel, Dr. Scott testified

further:

> With this type and degree of hearing loss, I would expect the Claimant to generally have difficulty hearing speech clearly in the presence of background noise, in groups, or in crowd situations. Without hearing aids, the Claimant will struggle with both the volume and the clarity of speech, particularly if the speaker is not facing her, has a soft voice, or is whispering. Additionally, the Claimant will have difficulty hearing speech over the phone and may have trouble hearing certain non-speech sounds such as the doorbell, equipment warning or alerting signals, a turn signal in the car, or an ambulance siren with the windows rolled up. She likely will have to ask people to frequently repeat themselves or to speak louder, especially if background noise is present. The Claimant would likely need the volume on the TV or radio set at a higher level as well. It may be difficult for the Claimant to engage in jobs involving complex or frequent verbal communication, interaction, or instructions, the ability to hear fine distinctions in speech or sounds, jobs in which hearing warning signals or alerts are required, and she may struggle with jobs that are verbally demanding, and jobs requiring telephone use.

(Tr. 436; see also Tr. 55-56.)  Dr. Scott also testified that Mr. Bradley's and Ms. Greco's testimony was consistent with the audiological records that she reviewed and her own findings.  (Tr. 58.)

Dr. Scott further observed that the extent of Ms. Greco's hearing loss in her right ear was so significant that it would not benefit from a hearing aid.[3]  (Tr. 53.) In contrast, however, she testified that the left ear was a "very good hearing aid candidate" and for that reason she expressed surprise that the hearing aid is "no longer working, or giving her any benefit in the left ear."  (Tr. 53)  Dr. Scott's testimony in this regard was somewhat limited, however, because of the fact that Ms. Greco was no longer treating with any specialists, and, therefore, there were no current testing data that might confirm or deny the benefits that she anticipated Ms. Greco might realize from a newer hearing aid in her left ear.  Nevertheless, at a subsequent hearing, Dr. Scott did not retreat from her prior testimony about the difficulties that she would expect Ms. Greco to face in many work situations, noting in particular that "[j]obs that are reliant on hearing and communications are

---

[3]  Indeed, Dr. Scott testified affirmatively that the extent of the hearing loss in Ms. Greco's right ear was severe enough that it would qualify under the Special Senses and Speech Listings set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1.  In the event a claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of a listing and meets the durational requirement, the claimant is deemed to be disabled at Step 3 of the 5-part sequential analysis.  Thus, it would appear that if the hearing loss in both of Ms. Greco's ears met or exceeded the degree of hearing loss identified in the right ear, she would have been found disabled at Step 3.

going to be very difficult with this hearing loss, I mean extremely challenging."

(Tr. 71.)

Dr. Scott did continue to assert that if Ms. Greco had a hearing aid for her left ear, her hearing would improve.   (Tr. 71-72.)   But even here Dr. Scott's testimony was nuanced and cautious.   When the ALJ asked her to compare Ms. Greco's hearing ability with and without a hearing aid for the left ear she said:

> That's really hard to judge.  I mean without a hearing aid she, even in her better ear she has a severe, moderate to severe hearing loss.  With a hearing aid it's hard to say how much it would improve because a hearing aid doesn't make your hearing normal, but it would – if people are talking to her on the left side, if she's able to face somebody and use visual cues, then I would expect that she could definitely get by a lot better with a hearing aid in her left ear than without one.  She wouldn't have to ask people to repeat as often.   It would still be challenging to work in occupations involving a lot of reliance on hearing, but she would do much better with a good hearing aid in that ear, is what I would expect.  It's hard for me to quantify in terms of like percentage.

(Tr. 72.)

Dr. Scott also recognized that although adverse reactions to hearing aid usage such as dizziness and headaches were "very rare," she tacitly acknowledged that they may occur, and said that such complaints would necessarily be subjective and difficult to measure objectively.  (Tr. 73.)  Furthermore, Dr. Scott testified that even though Ms. Greco might be expected to have good results with the use of a hearing aid in her left ear, she would still face a number of challenges, particularly

in environments with ambient noise, or where voices or sounds came to her from a distance or from the right side.  (Tr. 76.)  Additionally, even with the use of a hearing aid – and assuming that Ms. Greco could tolerate its use – Dr. Scott testified that

> I think it would be tough to [do] the kind of work where you're ask to attend a lot of meetings, ask questions, interpret verbal instructions, carry out tasks that involve having to follow – I mean anything that involves a heavy amount of hearing and communication, even with a hearing aid, is still going to be challenging.

(Tr. 76.)

Finally, Don Schader, a vocational expert ("VE"), testified at the hearing on May 5, 2014.  The VE opined that given the extent of her hearing loss, Ms. Greco could not return to her prior employment.  (Tr. 90.)  When turning to the question of whether the plaintiff could reasonably be expected to perform other jobs, the VE and ALJ agreed that this presented "a tough case."  (Tr. 91.)  The VE noted that he was aware of individuals who were capable of performing work despite significant hearing loss.  However, he then admitted being unfamiliar with the Social Security Administration's position on whether potential workplace accommodations may be factored into the residual functional capacity analysis.  Moreover, he testified that with some of the potential jobs he identified, a person like Ms. Greco "may not be able to do every single job duty as described in the DOT."  (Tr. 91.)  In response, the ALJ said that he would rely upon the VE's expertise.  (Tr. 91.)

The VE came up with three potential jobs that Ms. Greco might fill: mail room clerk, office helper, and cleaner/housekeeper. (Tr. 92-93.) Notably, in response to the ALJ's questions about the "degree of accommodation on how that might affect these numbers at all", the VE responded that he had found in his professional experience and research that "people who have this level of hearing loss, even if they can do the job, they have a hard time getting past the initial interview." (Tr. 94.) The ALJ did not explore this opinion in any way, other than to ask "Well, once they have the job how do they usually do?" (Id.)

In response to this question, the VE offered a single example of an employee who works in his office's mailroom who "can hear some things", but struggles because there is a lot of communication taking place in that work environment.[4] He then gave examples of a couple discrete tasks that this unidentified mailroom clerk performs, including delivering staplers or office supplies, and collecting mail. The VE also told the ALJ that even this office worker was accommodated and apparently was hired under a specific regulation or accommodation for people with significant hearing loss or other disability. (Tr. 94.) The ALJ inquired no further about this single example, or about the kinds of accommodations that might be

---

[4]  In response to questions from Ms. Greco's lawyer, the VE acknowledged that his professional experience with respect to the availability of workplace accommodations for mail room clerks and office workers was limited to this single employee working in his department. "But that's just . . . that's one person, that's one person in your office . . . so you can't testify as to other places, am I correct?" The VE acknowledged that he could not. (Tr. 97.)

13

required for Ms. Greco specifically to fulfill the obligations of mail room clerk or office helper or cleaner.

Ms. Greco's lawyer did ask for further clarification, eliciting testimony from the VE that an employee with hearing limitations such as those Ms. Greco suffers from would need accommodations in each of the three jobs identified.  (Tr. 95-96.) The ALJ did not follow up on this or seek further clarification at the conclusion of the hearing.

The ALJ issued a decision denying the plaintiff's application for benefits on May 8, 2014.  In the decision, the ALJ found that Ms. Greco met the insured status requirements for the Social Security Act through December 31, 2016, and found that she had not engaged in substantial gainful activity since July 1, 2010, the alleged onset date of disability.  (Tr. 17.)  The ALJ also found that the plaintiff suffered from bilateral sensoineural hearing loss, which he found to be a severe impairment, but at the next step did not find that her impairment meets or medically equals the severity of a listed impairment in 20 C.F.R. 404, Subpart P, Appendix 1.  (Tr. 18-19.)

The ALJ next found that Ms. Greco retained the residual functional capacity to perform a full range of work at all exertional levels, but found that she could not engage in complex or frequent communication, interaction, or instructions.  He also noted that she could not hear fine distinctions in speech or sound, and is

14

incapable of hearing warning signals or alerts, and cannot engage in verbally demanding tasks or telephone use. In making this finding, the ALJ concluded that the evidence, including the testimony of the plaintiff and her husband, supported a finding that her medically determinable impairments could reasonably be expected to cause a host of symptoms, but he concluded that "the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not fully credible." (Tr. 20.) As support for this finding, the ALJ noted that the claimant had engaged in some work and had received unemployment benefits after the alleged disability onset date. He also noted that evidence in the record did not support a finding that the plaintiff's hearing condition had worsened over time, and he referred to testimony from Dr. Scott that the use of a properly fitted hearing aid would likely improve Ms. Greco's hearing. (Tr. 21.)

The ALJ purported to give great weight to Dr. Scott's testimony as to the limitations on the plaintiff's ability to engage in a variety of work, and hence found that she was not able to engage in jobs involving "complex or frequent verbal communication, interaction, and instructions." (Tr. 21.) He also referred to Dr. Scott's opinion that Ms. Greco was unable to engage in jobs that would require her to hear fine distinctions in speech or sound, or that would require her to hear warnings or alerts, or that would be verbally demanding, or that would involve use of a telephone. (Tr. 21.)

15

The ALJ then turned to the testimony from the VE, and accepted his opinion that Ms. Greco could not engage in any of her past work.  After reciting the legal standards governing assessment of residual functional capacity, the ALJ purported to accept the testimony of the VE that Ms. Greco remained capable of performing the jobs of mail clerk, office helper, and cleaning/housekeeping.  (Tr. 23.)  The ALJ did not discuss this aspect of VE's testimony in any detail, and did not address the VE's opinion that given the extent of the plaintiff's hearing loss, Ms. Greco would likely require accommodations to perform the jobs he identified.  Nor did the ALJ address the VE's testimony that Ms. Greco would have substantial difficulty even making it past an interview were she to apply for such jobs, an impediment to employment which rendered these potential jobs largely illusory. (Tr. 23.)

## III.  DISCUSSION

### A.  Substantial Evidence Review – the Role of This Court

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); 42 U.S.C. §1383(c)(3); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012).  Substantial evidence "does not mean a large or considerable

amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966).

"In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F.Supp.2d 623, 627 (M.D. Pa. 2003). The question before this Court, therefore, is not whether a plaintiff is disabled, but whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014)("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); Burton

v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981)("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

### B.   Initial Burdens of Proof , Persuasion and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."   42 U.S.C. §1382c(a)(3)(A); see also 20 C.F.R. §416.905(a).   To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.   42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §416.905(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process.   20 C.F.R. §416.920(a).   Under this process, the ALJ must sequentially determine:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment;

(3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").   20 C.F.R. §416.920(a)(4).

Between steps three and four, the ALJ must also assess a claimant's RFC. RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§416.920(e), 416.945(a)(1).  In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis.  20 C.F.R. §416.945(a)(2).

At steps one through four, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work.  42 U.S.C. §1382c(a)(3)(H)(i)(incorporating 42 U.S.C. §423(d)(5) by reference); 20 C.F.R. §416.912; Mason, 994 F.2d at 1064.

Once this burden has been met by the claimant, it shifts to the Commissioner at step five to show that jobs exist in significant number in the national economy

that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC.  20 C.F.R. §416.912(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites.  Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination.  Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests."  Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981).  Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence.  Id. at 706-707.  In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding."  Schaudeck v. Comm'r of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999).

**C.** **The ALJ's Credibility Assessment Regarding the Plaintiff's Symptoms, Pain and Inability to Tolerate a Hearing Aid Lacks Adequate Support and is Not Sufficiently Explained**

The plaintiff initially challenges the ALJ's decision with respect to his treatment of Dr. Scott's testimony regarding the likely benefit that hearing aids

would provide, and regarding his assessment of Ms. Greco's credibility regarding the extent of her symptoms.

As an initial matter, the ALJ's decision failed adequately to address the testimony of the plaintiff and her husband that she no longer used hearing aids because she found that she was no longer receiving any benefit from them, and because her asymmetrical hearing loss caused the use of a hearing aid in her left ear to cause intolerable side effects including severe headaches, nausea, and sleep loss.  The ALJ did not reject this testimony explicitly, instead noting only that Dr. Scott had testified that a hearing aid would likely help Ms. Greco's left ear to some degree, and finding generally that the plaintiff's testimony about the extent of her symptoms was not fully credible.  The ALJ did not, however, make any finding regarding Ms. Greco's testimony concerning the adverse effects she claimed to have experience by the use of hearing aids.

The ALJ also did not address in any way Dr. Scott's admission that the use of hearing aids can, in some cases, result in adverse side effects and that it is very difficult to measure these complaints objectively.  This omission is significant because the issue of the plaintiff's credibility with respect to her professed inability to wear a hearing aid because of the profound side effects she had previously experienced bears directly on Dr. Scott's testimony about the likely benefit that a hearing aid could provide.  This is particularly important because although Dr.

21

Scott testified that the plaintiff would likely realize some benefit to the hearing in her left ear with the use of a hearing aid, she would nonetheless be subject to extensive limitations in a work environment.  The probative value of Dr. Scott's testimony thus turns in significant measure on whether the plaintiff could, in fact, tolerate use of a hearing aid in light of the adverse side effects she claimed to have suffered, something no witness disputed, which Dr. Scott acknowledged may occur in some cases, and which the ALJ never explained in terms of whether he credited any of the plaintiff's testimony in this regard.

When considering the credibility of an individual's subjective complaints of pain and other symptoms, the ALJ is obliged to consider "the entire case record, including the objective medical evidence, the individual's own statements . . ., statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record."  SSR 96-7, 1996 WL 374186 (S.S.A. July 2, 1996).  In undertaking this inquiry, however, "[the] ALJ must give serious consideration to a claimant's subjective complaints . . ., even where those complaints are not supported by objective evidence." Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993) (citing Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir. 1985); see also SSR 96-7, 1996 WL 374186, at *1 ("An individual's statements about the intensity and persistence of pain or other

symptoms or about the effect the symptoms have on his . . . ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.").

In this case, although the ALJ made some limited findings in concluding that Ms. Greco was not entirely credible regarding the extent of her limitations or symptoms, these findings were especially limited and the factual support for them was equally thin.  Thus, to support this finding regarding Ms. Greco's credibility, the ALJ noted only that the claimant had engaged in some work and had received unemployment benefits after the alleged disability onset date.  He also noted that evidence in the record did not support a finding that the plaintiff's hearing condition had worsened over time, and he referred to testimony from Dr. Scott that the use of a properly fitted hearing aid would likely improve Ms. Greco's hearing. (Tr. 21.)

Yet, the ALJ did not mention in any way whether he had considered the plaintiff's subjective complaints about the use of a hearing aid, the one thing that Dr. Scott said could be expected to provide some limited benefit to the hearing in her left ear, even though Dr. Scott also recognized that in rare cases patients may experience adverse side effects from using them.  In the absence of any discussion regarding this important consideration, and considering its omission in the context of a decision that provided spare discussion as to the reasons the ALJ purportedly

found the plaintiff less than fully credible regarding her condition and symptoms, the Court agrees with the plaintiff that the ALJ's decision regarding his assessment of Ms. Greco's credibility is not adequately supported.

### D.     The ALJ Failed to Address Meaningfully the Testimony of the VE and to Address Disputes in the Record Regarding Ms. Greco's Ability to Perform the Functions of the Jobs Identified

Next, Ms. Greco challenges the ALJ's treatment of the VE's testimony regarding her residual functional capacity and ability to engage in other jobs, arguing that the ALJ failed to address in any meaningful way the nuances of the VE's testimony, qualifications in that opinion which strongly suggested that Ms. Greco could not secure gainful employment.  The Court agrees.

To read the ALJ's decision regarding the three potential jobs that Ms. Greco could be expected to perform given her residual functional capacity, one might be led to believe that the VE had concluded that she could fulfill the requirements of each of these jobs without further consideration or qualification.  Review of the VE's testimony, however, reveals that it was qualified in numerous important ways, and acknowledged that even in the three jobs that were identified, Ms. Greco would likely (1) need accommodations to perform the job requirements and (2) have little chance of ever obtaining such jobs because her hearing impairment made it unlikely that she would ever get past an interview.  Rather than addressing either of these concerns at the hearing or in his written decision, the ALJ purported

24

to rely on the VE's testimony as support for a finding that Ms. Greco could manage to work in any of the three job fields identified given her residual functional capacity.

By any reading, the VE's opinion testimony was hesitant and qualified.  Far from unqualified, affirmative testimony that the plaintiff was capable of performing each of the jobs identified, the VE raised caution flags throughout his testimony.  First, he agreed with the ALJ that this was a "tough case," (Tr. 91.), and noted at the outset that someone with Ms. Greco's severe hearing loss would likely require accommodation in order to perform the jobs identified, and that with at least "some" of the three jobs, "the person may not be able to do every single job duty as described in the DOT." (Tr. 91.)  Rather than address the VE's apparent uncertainty about whether Social Security guidelines permit consideration of the availability of workplace accommodations, the ALJ informed the VE that the ALJ would simply rely upon his "professional expertise" in identifying jobs that someone with Ms. Greco's limitations could be expected to perform.

In this regard, the ALJ specifically asked the VE, "Are there any other jobs in the economy that this person could do with whatever reasonable accommodations would be necessary?" (Tr. 94.)  Without further explaining the kinds of accommodations that would be required, the VE identified three jobs, and did not offer any testimony to suggest that there were other jobs that she could also

fill.  After the VE had identified the three jobs and discussed their availability in the local, regional and national economy, the ALJ asked the VE to give professional guidance "on the degree of accommodation on how that might affect these numbers at all."  (Tr. 94.)   Before even addressing that question, the VE noted that even in such cases where a claimant with Ms. Greco's level of hearing loss could do some of the jobs, she would "have a hard time getting past the initial interview."  (Tr. 94.)  This was, in our view, a significant admission by the VE.  It suggested that this employment was, in fact, not available to Ms. Greco.  Yet the ALJ moved past this observation without comment, asking only how those claimants who did manage to get past the interview fare in the jobs.  The VE's testimony in response was both limited and important.  Relying upon his own experience, the VE identified only a single individual who worked in his office's mail room who did "some of the work of an office helper" and was, therefore, "accommodated" in some way.  He also appeared to testify that this worker in his office was hired under a special hiring provision for applicants with special need or disability.[5]  (Tr. 94.)  The ALJ inquired no further into this area, instead turning the matter over to the plaintiff's counsel, who elicited testimony from the VE that the

---

[5]  The VE's testimony on this point is somewhat unclear.  In response to the ALJ's question, "So is it your estimate that she is accommodated in doing this job?" the VE answered, "I think she's accommodated.  She also was hired under 55B which is a special –".  (Tr. 94.)  The remainder of the VE's answer is unclear from the record, but it appears the ALJ understood him to mean that there are "supports for people with such limitations."  (Tr. 94.)

jobs he identified would likely have to be modified in some way to accommodate the plaintiff's needs owing to her hearing impairment.  (Tr. 95.)

The VE's' testimony regarding the likely need for workplace accommodation, and the discrepancies between the jobs as modified by accommodation and their description the DOT required additional development at the hearing, and further explanation in the ALJ's written decision.  The ALJ erred by failing to develop the record as needed, and in failing to explain the basis for his decision, which suggests only that he had accepted the VE's testimony that Ms. Greco could reasonably expected to perform the three jobs he identified, which is simply not what is reflected in the VE's cautious and uncertain testimony.

In similar circumstances, The Third Circuit Court of Appeals has been "troubled . . . by the hesitation with which the VE identified the three possible occupations for [a claimant]."  Boone v. Barnhart, 353 F.3d 203, 209 (3d Cir. 2003); (citing Sias v. Sec'y of Health & Human Servs., 861 F.2d 475 (6th Cir. 1988) ("[I]f the expert is unable to testify without qualification about the jobs a claimant can perform, the ALJ may not rely on his opinion.")).  In Boone, the court of appeals was troubled by a conflict in the record between the VE's testimony and the job listings in the DOT, which worked to the disadvantage of the claimant, as it did in this case.  Id.  The court found that the VE's hesitation regarding the jobs identified, their possible conflict with the DOT, "and the failure of the VE and the

ALJ to acknowledge (much less explain) this conflict" meant that "the VE's testimony does not by itself provide substantial evidence of a significant number of jobs in the economy that [the claimant) can perform." Id.[6]  The court of appeals held that remand was appropriate because the VE's testimony was inconsistent with the DOT information "and because no other substantial evidence existed in the record to determine the ALJ's step 5 determination." Rutherford v. Barnhart, 399 F.3d 546, 557 (3d Cir. 2005) (explaining Boone).

In Rutherford, the court of appeals distinguished Boone, but in doing so provided instruction that is applicable to this case and the conflicts in the VE's testimony that went unresolved and unexplained.  The court noted that SSR 00-4p obligates an ALJ to develop the record during an adjudicative hearing where conflict exists between a VE's testimony and the DOT.  That ruling provides:

> When there is an apparent unresolved conflict between VE . . . evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is disabled.  At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

---

[6]  In Boone, the Third Circuit found that it needed to peruse the record to determine whether it contained sufficient evidence to resolve the conflict.  The Court finds that such an inquiry is not possible on the record that was developed in the instant case, and the parties have not further addressed or developed this issue in their briefs.

SSR 00-4p, 2000 WL 1898704 (S.S.A. Dec. 4, 2000).  The court of appeals has instructed that "inconsistencies between vocational expert testimony and DOT information may run afoul of that more general requirement – and may warrant reversal as a result – even when they do not come within the literal obligation imposed by SSR 00-4p."  Rutherford, 399 F.3d at 557.  The court also cautioned that reversal may not be required in all cases where an ALJ has failed to address such inconsistencies, such as where there existed other substantial evidence to support the ALJ's step-5 determination, or where the VE did not testify that the jobs identified were an exhaustive list but were simply exemplars of the kinds of work that a claimant could perform given her limitations.  Id.; see also Jones v. Barnhart, 364 F.3d 501, 506 (3d Cir. 2004).

In this case, the VE limited his testimony to three potential jobs, two of which he acknowledged were substantially similar, and he explicitly testified that "with some of these jobs the person may not be able to do every single job duty as described in the DOT." (Tr. 94.)  The ALJ did not follow up on this testimony, or elicit further explanation regarding these acknowledged discrepancies between the job requirements and the need for accommodation.  The failure to resolve this issue at the hearing, or to address and explain it in any meaningful way in the ALJ's written decision warrants remand for further consideration, since the record would not permit the Court to find that other substantial evidence in the record could

support a finding that Ms. Greco was capable of performing each of the three jobs

that the VE identified.

Remand is further appropriate because the testimony of the VE suggested

that Ms. Greco might only be capable of performing the jobs he identified if she

were granted certain accommodations.  The ALJ did not address this issue in any

substantive way, or elicit substantial testimony from the VE regarding the kinds of

accommodations that would be needed or available; instead, the VE provided only

a single example of a person who worked in his office who was apparently offered

some modified accommodations that allowed her to perform some of the jobs of an

office worker.  The ALJ did not inquire further into the types of accommodations

that Ms. Greco might require to perform any of the three jobs the VE identified.

Instead the record was simply left undeveloped, with even the VE's own question

about the extent to which he could permissibly consider reasonable workplace

accommodations going unaddressed.  Upon remand, this is also an area that should

be developed and considered in determining whether Ms. Greco meets the

requirements for being awarded benefits.

On remand, we caution that to the extent the VE considers the availability of

potential accommodations in order for Ms. Greco to be qualified for any of the jobs

he believed she could perform, the Supreme Court has explained that "when the

SSA determines whether an individual is disabled for SSDI purposes, it does ***not***

take the possibility of 'reasonable accommodation' into account, nor need an applicant refer to the possibility of reasonable accommodation when she applies for SSDI." Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 803 (1999) (citing Memorandum from Daniel L. Skoler, Associate Comm'r for Hearings and Appeals, SSA, to Administrative Appeals Judges, reprinted in 2 Social Security Practice Guide, App. § 15C[9], pp. 15-401 to 15-402 (1998)) (original emphasis).

In summary, the Court thus finds that the ALJ's summary and treatment of the VE's testimony is not supported in the actual record of that testimony, and the ALJ consequently made findings regarding Ms. Greco's residual functional capacity to perform particular jobs that was not based upon substantial evidence. These shortcomings in the decision to deny benefits cause the Court to find that it was not based upon substantial evidence, and, therefore, it will be remanded for further consideration that is in accord with prevailing Agency guidelines and the law governing this field.

## IV.    **CONCLUSION**

For the foregoing reasons, Ms. Greco's appeal of the ALJ's adverse decision will be GRANTED and this matter remanded to the Commissioner for further consideration of Ms. Greco's claim for Title II benefits.

An Order consistent with this memorandum will issue separately.

/s/ **Martin C. Carlson**
Martin C. Carlson
United States Magistrate Judge

Dated:  March 6, 2017